UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-81253-CV-ALTMAN

SLOBODAN DRAGIC,

　　　*Petitioner*,

*v.*

MARK S. INCH,

　　　*Respondent.*

_____/

## ORDER

The Petitioner, Slobodan Dragic, has filed a *pro se* Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging his 2014 conviction and sentence. *See* Petition [ECF No. 1]. The Court referred the Petition to United States Magistrate Judge Lisette M. Reid, who issued a Report and Recommendation (the "Report") [ECF No. 18]. In her Report, the Magistrate Judge recommended that the Petition be denied on the merits. *Id.* at 21. The Petitioner timely filed Objections to certain parts of the Report. *See* Objections to Report ("Objections") [ECF No 19]. For the reasons set out below, the Court now **OVERRULES** the Petitioner's Objections, **ADOPTS** the Report, and **DENIES** the Petition.

### THE FACTS

At 7:30 on the morning of September 30, 2012, the Petitioner and his wife had an argument in the driveway of their house. Trial Tr. [ECF No. 13-1] at 130. The argument ended when the Petitioner pulled out a gun and shot his wife, who had begun to walk away, in the back. *Id.* Not content to let her lie there, the Petitioner walked over to his wife, stood over her, and shot her point-blank in the head. *Id.* He then got into his van and drove to a nearby park, where he was arrested. *Id.* at 84. A few weeks later, the State charged him with first-degree murder. Indictment [ECF No. 12-1] at 2. At trial, the Petitioner conceded that he'd shot his wife. *See* Trial Tr. at 456. The only issue for the jury,

then, was whether the Petitioner—who advanced a "heat of passion" defense—intended to kill her. *See, e.g., id.* at 105.

The State's first witness was the Petitioner's daughter, Suzana Dragic. *Id.* at 109. Suzana testified that her mother was unhappy in her marriage and had filed a divorce petition about two weeks before the murder. *Id.* at 125–26. The Petitioner, Suzana added, had learned of the divorce petition and had asked Suzana to help him with a response. *Id.* at 126.

The prosecution next called a neighbor—Enrique Gonzalez—who recounted that, as he was preparing to take his daughter to school that morning, he heard a gunshot and then "like four or five seconds went by" before he heard a second shot and went running into the street. *Id.* at 188. Once in the street, he "saw a gentleman standing, looking towards my house, with a gun in his right hand, like at the height of his hips." *Id.* The neighbor identified the man as the Petitioner. *Id.* at 196. The neighbor added that, when he looked behind the Petitioner, he noticed a body laying prostrate on the paved driveway. *Id.*

Then came a second neighbor, Roberta Coleman, who testified that, between six and eight years earlier, the Petitioner had told her that, if "[his wife] ever left him, he'd kill her." *Id.* at 208, 210. On the day of the shooting, Coleman said, her daughter burst into her bedroom and shouted that "Suzana's dad just shot their mother in the driveway." *Id.* at 213. Coleman then heard the second gunshot, ran out into the street, and saw the Petitioner, who was walking towards his van with something in his hand. *Id.* at 213. The Petitioner then got into his car and "just looked right at me . . . [as he] slowly rolled off." *Id.* at 214. With the Petitioner gone, Coleman rushed over to the Petitioner's driveway, where she found the Petitioner's wife, covered in blood. *Id.* at 217.[1]

---

[1] For the sake of brevity, we'll omit any specific mention of the other prosecution witnesses because the Petitioner doesn't object to their testimony. So, for example, the State called a police officer who responded to the scene, *see id.* at 254; a crime-scene investigator, *see id.* at 262; and a medical examiner, *see id.* at 268. In addition, the State relied on the testimony of the officer who arrested the Petitioner,

After the State rested, the defense called just one witness: the Petitioner, who tried (and failed) to mount a "heat of passion" defense. *See id.* at 105. He confessed that his marriage was failing—but claimed that the divorce was mutual. *Id.* at 423. On the day of the murder, he testified, he couldn't sleep and woke up to find his wife arguing with his son. *Id.* at 426. After his son had left, his wife began "attacking [him] verbally." *Id.* at 431. She said "all the worst possible words. To [the Petitioner], her words were worse than being hit." *Id.* at 432. This verbal abuse, the Petitioner insisted, happened frequently, "and on a million occasions I would move away. But there are times, and this is because of my blood pressure and sugar, that I just would black out and I lost control." *Id.* Crucially, the Petitioner denied ever intending to kill his wife. *See id.* at 435 ("Q: At any time before you fired the gun did you have a conscious thought to kill her, did you do anything in your mind that led you to do this, did you intend to kill her? A: No, no, no. This could not have happened to me under normal circumstances, for sure.").

On cross-examination, though, the Petitioner admitted that he'd bought the gun "two weeks" before killing his wife—around the time when he was served with divorce papers. *Id.* at 437–38. And he admitted that, when he "came to"—and saw that his wife had been shot in the head and back—he simply drove away, left his wife to die on the driveway, did not call 911, and never sought medical attention. *Id.* at 446.

In its closing, the State emphasized the timing of events: the victim, the prosecutor explained, had filed for divorce on September 13, 2012; she had served the divorce papers on the Petitioner on September 17, 2012; and—despite his insistence that the divorce was mutual—the Petitioner had enlisted his daughter (Suzana) to help him contest the divorce. *Id.* at 583. Just a few days later (on the 30th), the Petitioner killed his wife. *Id.* And, "according to his own words, he bought that gun about

---

*see id.* at 301; a second and a third crime-scene investigator, *see id.* at 312, 321; and the doctor who tried unsuccessfully to save the victim's life, *see id.* at 330.

two weeks before her death"—in other words, just after he was served with the divorce papers. *Id.* On the day of the murder, the State added, the Petitioner shot his wife in the lower back, walked over to where she was writhing in pain, stood over her, and shot her at point-blank range in the head. *Id.* at 584. Most crucially, the prosecutor argued, instead of calling 911 or asking for help, the Petitioner got into his van, looked at his neighbor from across the street, and slowly drove away. *Id.* at 587.

Turning to premeditation, the State's closing was clear and unambiguous: "Members of the jury, this was premeditated. This was premeditated. This was premeditated. And we know that because this was not [a] quick succession [of] shots, bang, bang. There was—there was a pause, there was reflection, there was time, there was opportunity to reflect." *Id.* at 595–96. The prosecutor closed by shredding the Petitioner's heat-of-passion defense: "The words that supposedly [the victim] said that morning, was that sufficient? . . . If not, you can—he can be angry. Let me make this clear. You can be angry. That does not mean that anger is heat of passion. You have to decide based on this definition if there was adequate provocation sufficient to obscure the reason or dominate the volition of an ordinary and reasonable man. And if not—if not, then you find him guilty as charged." *Id.* at 598.

In response, the defense emphasized how remorseful the Petitioner was and how little evidence there was of premeditation:

> The man buys a gun. He lives with the woman. They're together most of the time. And yet his big plan is to walk out into the driveway in broad daylight, 7:30 on a workday, when anyone else could be around, and shoot her at the end of the driveway where other people can see. That's not premeditation. Also, if he had planned this, why stop at the park? Why get in your car and drive off to a nearby park? Why not get in your car and drive off to another state, keep going until the police pull you over, drag you out?

*Id.* at 606–07.

The jury convicted the Petitioner of first-degree murder, and the judge sentenced him to life in prison. *See* Judgment [ECF No. 12-1] at 17; Sentence [ECF No. 12-1] at 18. The Petitioner now asks this Court to vacate his conviction and sentence. *See generally* Pet.[2]

## STANDARD OF REVIEW

When a magistrate judge's "disposition" has been properly objected to, district courts must review that disposition *de novo*. FED. R. CIV. P. 72(b)(3). But, when no party has timely objected, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." FED. R. CIV. P. 72 advisory committee's notes (citation omitted). Although Rule 72 itself is silent on the standard of review, the Supreme Court has acknowledged that Congress's intent was to require *de novo* review only where objections have been properly filed—and not when neither party objects. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a magistrate [judge]'s factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."). "A party filing objections must specifically identify those findings objected to and the specific basis for such objections." *Hidalgo Corp. v. J. Kugel Designs, Inc.*, 2005 WL 8155948, at *1 (S.D. Fla. Sept. 21, 2005). Therefore, the "[f]ailure to object to the magistrate [judge]'s factual findings after notice precludes a later attack on these findings." *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988) (citing *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. 1982)).

## THE LAW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") instructs district courts to deny any claim that was "adjudicated on the merits" in a state-court proceeding unless that

---

[2] We'll skip an outline of the Petitioner's state-court appeals—direct and collateral—as well as any mention of AEDPA's procedural requirements—timeliness and exhaustion—because we address all three of the Petitioner's claims *on the merits*.

adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (summarizing 28 U.S.C. § 2254(d)–(e)).

To have "adjudicated [the claim] on the merits," the state court need not have issued any kind of formal opinion or even outlined its reasoning. *Id.* at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Rather, when a state court does not include the reasons for the denial, the federal court must "'look through' the unexplained decision to the last related state-court decision that does provide a rationale" and "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

"Clearly established Federal law" means "the holdings, as opposed to the dicta, of [the United State Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To be "contrary to clearly established federal law, the state court must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a different result from the Supreme Court when faced with materially indistinguishable facts." *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010) (cleaned up).

For "a state court's application of [Supreme Court] precedent" to be "'unreasonable, the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003) (cleaned up). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Harrington*,

562 U.S. at 101. "And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (cleaned up).

Section 2254(d) similarly prohibits federal judges from reevaluating a state court's factual findings unless those findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To establish that a state court's factual findings were unreasonable, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155–56 (quoting 28 U.S.C. § 2254(e)(1)).

"AEDPA's standard is intentionally difficult to meet." *Woods*, 575 U.S. at 315 (cleaned up). When reviewing state criminal convictions on collateral review, "federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 316 (quotation marks omitted).

## ANALYSIS

### I.  Exhaustion

The Petitioner first contends that the Magistrate Judge erred in finding that he had failed to exhaust Grounds One and Two of his Petition. *See* Obj. at 1–2 ("Contrary to the Magistrate's affirmative defense the Petitioner maintains his argument that he has exhausted Grounds One and [T]wo[.]"). But the Magistrate Judge said no such thing. To the contrary, the Report intentionally

ignored the State's exhaustion arguments and opted, instead, to address the Petitioner's claims *on the merits*. *See* Report at 8 ("To promote judicial efficiency, the merits of the allegedly unexhausted claims have been addressed within this Report."). There was nothing improper about this tactical move—nor, to his credit, does the Petitioner ever suggest that there was. AEDPA, after all, allows a district court to deny a habeas petition on the merits *even if* the claims are unexhausted. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Because the Magistrate Judge never determined that Grounds One and Two were unexhausted, the Petitioner's first Objection is **OVERRULED**.

## II.     Ground One: The Jury Instructions

In Ground One, the Petitioner contends that the trial court erred by giving a jury instruction on his "heat of passion" defense that erroneously led the jury to believe that "the state did not have to prove premeditation to convict of first degree murder and did not have to prove deprave mind to find second degree murder." Pet. at 4.

The Petitioner was accused of first-degree murder. *See* Jury Instr. [ECF No. 12-1] at 4. The Petitioner's jury instructions noted that "it is a defense to First Degree Murder if you find the killing of [the victim] was done by [the Petitioner] in the 'heat of passion.' . . . In such case, the 'heat of passion' negates the requirement of First Degree Murder that the act be done with premeditation.'" *Id.* at 6. The judge gave a similar instruction on the lesser-included offense of second-degree murder: "It is a defense to Second Degree Murder if you find that the killing of [the victim] was done by [the Petitioner] in the 'heat of passion.' . . . In such case, the 'heat of passion' negates the requirement of Second Degree Murder that the act be done with a depraved mind." *Id.* at 9.

As the Report explained, the only material difference between the standard jury instructions and the trial court's version was the trial court's substitution of the word "requirement" for "element."

Report at 11–14. Despite this distinction, the Report concluded that, "when read as a whole, the instructions informed the jury that if it found that [the] Petitioner acted in the heat of passion, it could convict him of a lesser offense." *Id.* at 13–14. In other words, "the trial court's heat of passion jury instruction did not infect the entire trial in such a way the Petitioner was deprived of due process." *Id.* at 15.

The Petitioner disagrees. In his view, the trial court's version of the heat-of-passion instruction "infected the most fundamental potion [sic] of the Petitioner's trial" because it deprived him of "a valid defense." Obj. at 3. The court's instruction, the Petitioner maintains, would have led the jury to believe that, "if they found [the] Petitioner acted in the heat of passion, they did not have to find [that he acted with a] depraved mind to convict him of second degree murder." Pet. at 5.

The Petitioner has a steep hill to climb. Generally speaking, the "fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991). That said, the Supreme Court has carved out an exception for cases in which "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). In deciding whether the challenged instruction "infected" the entire trial, "the habeas court should consider the context of the instructions as a whole as well as the entire trial record." *Parker v. Sec'y, Dept. of Corr.*, 331 F.3d 764, 779 (11th Cir. 2003). In doing so, this Court must assess "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Estelle*, 502 U.S. at 72.

For three reasons, this Court agrees with the Magistrate Judge that the insertion of the word "requirement" did not "infect" the Petitioner's "entire trial." *First*, the instructions included other language—which the Petitioner never mentions—that mooted his concerns. So, for instance, just one paragraph above the challenged language, the jury instructions explained that "[i]t is a defense to First Degree Murder if you find the killing of [the victim] was done by [the defendant] in the 'heat of

passion.'" Jury Instr. at 6. It would thus have been clear to the jurors that "heat of passion" was a *defense* to the crime of first-degree murder. A defense, of course, is something very much beneficial to the criminal defendant. In our case, for example, the Petitioner and his lawyer tried very hard to get the jurors to buy that defense. It's not too much to say, in fact, that the whole case was about whether the Petitioner could establish his "heat of passion" defense. Viewed in this context, it would have been unreasonable for the jurors to believe that, by making a finding that was *helpful* to the defendant—viz., that he committed the crime "in the heat of passion"—they were in effect doing something that was deeply *unhelpful* to him—i.e., eliminating the State's burden on the critical element of premeditation. In other words, if we accepted the Petitioner's theory of what happened here, we'd have to accept the absurd proposition that follows—namely, that the jury was told (and that the jury believed) that the Petitioner had gone to great lengths to persuade them of a theory that, if successful, would have made it much *easier* for the State to convict him. Jurors may not be trained lawyers, but it's not our practice to assume that they behave irrationally. *See United States v. Browne*, 505 F.3d 1229, 1262 (11th Cir. 2007) ("[W]e presume that juries do not make irrational choices when presented with options supported by evidence.").

   *Second*, in their closing arguments—and, really, throughout the entire trial—both sides emphasized the *correct* reading of the law. The State, for instance, told the jury that "it's a defense to first-degree murder if you find that the killing . . . was done . . . in the heat of passion." Trial Tr. at 598. The defense lawyer argued that "it's a defense if you find the killing was done in the heat of passion," *id.* at 617, and added that: "All of this gives you a reasonable doubt that [the petitioner] acted with premeditation. It presents a reasonable doubt that [the petitioner] acted with a depraved mind, that he acted from his mind at all. Now, if the State did not prove evidence of thought, then they didn't prove murder, they proved manslaughter," *id.* at 622. Even if we assume that the jurors were confused by the instructions, in other words, we'd have to find that the lawyers clarified that

10

misunderstanding by making the following legal proposition pellucid: if the Petitioner acted "in the heat of passion," the jury *could not* find him guilty of first-degree murder because "heat of passion" is "a defense" to that crime.

*Third*, the Petitioner cannot establish that the court's deviation from the standard instructions "infected the entire trial" with unfairness. The Petitioner was represented throughout the litigation—and especially at trial—by competent counsel who ably cross-examined the State's witnesses and repeatedly called into question much of the State's evidence. She, in fact, won several crucial evidentiary fights—viz., preventing a neighbor from testifying about the Petitioner's prior violent attacks on his wife, *see id.* at 162; precluding the same neighbor from describing how (and why) she had advised the victim to leave before the Petitioner could kill her, *see id.* at 500; and excluding Suzana's testimony that her mother would never have wanted the Petitioner to own a gun, *see id.* at 512. The Petitioner was also afforded the opportunity to call his own witnesses, to present his own evidence, and to testify in his own defense—which he did. *Id.* at 370–437. And the Petitioner's counsel gave the jury an impassioned closing argument—in which she specifically (and clearly) outlined the contours of the "heat of passion" defense and urged the jury to find the Petitioner *not* guilty of *both* first- and second-degree murder. *Id.* at 601–24.

All this is to say that, even if the judge's altered instruction were erroneous, that relatively minor error didn't "infect the entire trial" to the point that the "resulting conviction violates due process." *Estelle*, 502 U.S. at 72; *see also Jamerson v. Sec'y, Fla. Dep't of Corr.*, 410 F.3d 682, 690 (11th Cir. 2005) ("Our inquiry also is not whether the challenged instructions were undesirable, erroneous, or even universally condemned." (cleaned up)); *Sanchez v. Sec'y, Fla. Dep't of Corr.*, 819 F. App'x 675, 677 (11th Cir. 2020) ("A jury instruction that is incorrect under state law is not a basis for habeas relief.").

The Petitioner's second objection is therefore **OVERRULED**.

### III.    Ground Two: The Evidentiary Ruling

In Ground Two, the Petitioner argues that the trial court erred by allowing one of his prior statements—that he would kill his wife if she left him[3]—into evidence. Pet. at 6. This "remark," the Petitioner says, "was too rmote [sic] in time to be probative of intent[.]" *Id.* at 6. The Report found that, even if the court erred in allowing the statement to come in, that error did not violate the Petitioner's due-process rights because (1) the State didn't emphasize the statement during the trial, and (2) the State had more than enough without it. *See* Report at 16–17.

The Petitioner objects. *See* Obj. at 3. As he sees it, "[t]he Magistrate errs [sic] in determining that Petitioner suffered no prejudice from Ms. Coleman's testimony . . . . Contrary to the magistrates [sic] report, Ms. Coleman's testimony should have been deemed inadmissible."). But the Report never found that the testimony *was* admissible. *See* Report at 16–17. Instead, the Magistrate Judge concluded that, "even if admitting [the] Petitioner's statements constituted an error," the Petitioner's due-process rights were not violated.

In any event, a state court's evidentiary decisions are generally not cognizable in a federal habeas petition. *See Taylor v. Sec'y, Fla. Dep't of Corr.*, 760 F.3d 1284, 1295 (11th Cir. 2014). A habeas petition challenging a state court's evidentiary ruling will be granted only where the evidence "so infused the trial with unfairness as to deny due process of law." *Smith v. Jarriel*, 429 F. App'x 936, 937 (11th Cir. 2011) (cleaned up). "Such a determination is to be made in light of the evidence as a whole." *Felker v. Turpin*, 83 F.3d 1303, 1312 (11th Cir. 1996). And the Petitioner makes no effort to show that the admission of his prior statement, when viewed "in light of the evidence as a whole," suffused the entire trial with unfairness. *See generally* Pet.; Obj.

---

[3] Ms. Coleman testified that the Petitioner told her—on three separate occasions—that he would kill his wife if she ever tried to leave him. *See* Trial Tr. at 208 ("He said that if he ever—she ever left him, he'd kill her . . . . At least three [times].").

Nor could he. The record, after all, is *replete* with evidence of his premeditation. So, for example, on cross-examination, the Petitioner admitted that he bought a gun "ten days to two weeks before [the] murder." Trial Tr. at 437. In fact, the Petitioner confessed that, while he ordinarily "kept [the] gun in [his] car," on the day of the murder, he took it out of his car and "walked around with it in [his] pocket." *Id.* at 438–39. The Petitioner also conceded—again, during his testimony—that he killed his wife just "thirteen days after" she "served [him] with divorce papers." *Id.* at 438. And the Petitioner's daughter testified that, although she spoke to her mother "multiple times a day" about "about all types of things," her mother never mentioned "a gun [being] in the house" and never "discussed [buying] a gun for the house" with the Petitioner. *Id.* at 518–19. Indeed, the Petitioner acknowledged that he didn't "speak about [buying a gun]" with his wife and "[did] not know if [the victim] knew" that he had bought one. *Id.* at 449. In closing, the State emphasized the crucial, premeditated pause between the first and second shots. *Id.* at 595–96 ("And we know that because this was not [a] quick succession [of] shots, bang, bang. There was—there was a pause, there was reflection, there was time, there was opportunity to reflect."). Finally, the State argued that the Petitioner's conduct *after* the murder was compelling proof of his intentions. The Petitioner, after all, admitted that, once he "came to," he wasn't at all surprised to find his wife lying in a pool of her own blood in his driveway. *Id.* at 446. Instead, he calmly walked to his van, stared at his neighbor, and slowly drove away. *Id.* The Magistrate Judge thus correctly found that "[t]he jury heard other evidence that Petitioner's act of killing his wife was premeditated." Report at 16; *cf. Felker*, 83 F.3d at 1311–12 (relying on "other evidence" to show that the challenged "testimony did not so infuse the trial with unfairness as to deny . . . fundamental fairness and due process of law").

Nor was the Petitioner's prior statement a major part of the trial. And that's unsurprising. It's not as though the statement contained a confession—explicit or otherwise—to the charged crime. It was, rather, a vague admonition, made to a neighbor many years before the alleged crime occurred.

Probably for this reason, the State referenced the statement only *twice* in the entire trial: once when it came into evidence and once during closing arguments. *See* Trial Tr. at 587 ("And [Ms. Coleman] told you that she was present when [the Petitioner] said that if [the victim] left him, he would kill her."); *see also* Report at 16 ("During closing argument, the state focused on this other evidence and only mentioned the Petitioner's prior statements once."). All (or nearly all) erroneous evidentiary decisions will similarly result in the evidence being discussed, at a minimum, two times—once when it's introduced and once in closing arguments. To hold that such a statement "infused" the whole trial with unfairness would thus eviscerate the general rule that a state court's evidentiary decisions are generally not subject to federal habeas review.

The Petitioner's third objection, in short, is **OVERRULED**.

## IV.    Ground Three: Ineffective Assistance of Counsel

In Ground Three, the Petitioner argues that his trial lawyer was ineffective for failing to pursue an insanity defense. *See* Pet. at 8 ("Petitioner['s] allegations and available evidence regarding mental and medical infirmities, along with reports of his erratic behavior prior to the shooting, provided a potential viable insanity defense sufficient to warrant a complete investigation by counsel."). Here, the Petitioner insists that "[w]eeks before [the shooting he] was acting very strange, had become very distant, and was suffering psychotic episodes. These episodes were exacerbated by [his] drinking and were laced with flashbacks of Eastern Europe." *Id.* at 9. Worse, he "had been experiencing visions of the dead he had known in Bosnia and Herzegovina; that they frequently spoke to him, but that he did not understand what they were saying." *Id.* And, "in the months preceding the shooting, the Petitioner was sleeping 2–3 hours a night and dreaming Bad Things were going to happen. When awake, [he] was mildly hallucinating, often finding himself at locations he did not remember going. He was depressed, paranoid to the extent that he would not speak with any neighbors except for [one]." *Id.* The Petitioner thus blames his lawyer for "even failing to investigate the applicability of an insanity

defense." *Id.* at 8. In his view, "if counsel had conducted a proper investigation into [his] mental and physical health issues, he would have discovered that the services of a Forensic Psychiatrist/Physical Defense expert was necessary for the defense and would have moved for appoint[ment] of that expert." *Id.* at 10.

The Petitioner presented this claim in a Rule 3.850 motion he filed in state court. *See* Rule 3.850 Motion [ECF No. 12-1] at 70. In summarily denying that motion, the state court incorporated the State's response. *See* Order Denying Pro Se Motion for Post Conviction Relief [ECF No. 12-1] at 371. In that response, the State pointed out that Dr. Brannon—who had evaluated the Petitioner on his capacity to waive *Miranda*—"testified [during his deposition] that he reviewed the probable cause affidavit, police reports, the video recording of the defendant's statement, and later met with the defendant for a total of 5 to 6 hours over a period of 3 days." State's Response to Motion for Post Conviction Relief [ECF No. 12-1] at 88. Still, the State noted, Dr. Brannon had found no evidence that the Petitioner had ever suffered from a mental disease. *Id.*

The State also relied on a mountain of record evidence for its view that the Petitioner's trial counsel had reasonably rejected an insanity defense as not "viable." *See id.* at 88–93. For instance, at trial, two witnesses testified that "there was a pause between the first and second shots fired"—thus establishing that "the defendant was deliberate when shooting his wife." *Id.* at 92. Moreover, after shooting his wife in the head, the Petitioner "was capable of reaching his niece . . . by phone and informing her that he had killed his wife, was able to drive safely to a park without getting into an accident, and was able to compose letters while sitting in his van"—all indicating that the Petitioner "had the capacity to reason." *Id.* at 93 (cleaned up).

The Fourth District Court of Appeal ("Fourth DCA") affirmed the trial court's denial without a written opinion. *See Dragic v. State*, 227 So. 3d 591 (Fla. 4th DCA 2017). Since the Fourth DCA affirmed without a written decision, we "look through" to the next reasoned decision (i.e., the trial

court's Order Denying Post Conviction Relief, which incorporated the State's Response) as the presumptive reasoning of the Fourth DCA. *See Wilson* 138 S. Ct. at 1192 (explaining that "federal court[s] should 'look through' [an] unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning").

The Petitioner now insists that the state courts' rejection of his claim constituted an unreasonable application of federal law. *See* Pet. at 8. The Magistrate Judge disagreed. As she explained, under Florida law, a criminal defendant advancing an insanity defense must "prove by clear and convincing evidence that due to a mental infirmity, disease or defect, he or she . . . [d]id not know what he or she was doing or its consequences"; otherwise, he must show that, "[a]lthough the defendant knew what he or she was doing and its consequences, the defendant did not know that what he or she was doing was wrong." Report at 17 (quoting FLA. STAT. § 775.027(1)). As the Report detailed, the problem with the Petitioner's argument is that there's no evidence for it. To the contrary, *all* the available evidence supports the State's view that the Petitioner suffers from *no* mental illness at all.

Before trial, for instance, the Petitioner was evaluated by two psychologists—Drs. Michael Brannon and Stephen Alexander. *See* Brannon Dep. [ECF No. 12-1] at 99–168; Alexander Dep. [ECF No. 12-1] at 170–256. Dr. Brannon met with the Petitioner three times—once to interview him, once to test his ability to understand his *Miranda* rights, and once to conduct a "wide range achievement test." Brannon Dep. at 116. When asked if the Petitioner suffered from *any* mental illnesses, Dr. Brannon replied: "None that I was able to say. I mean he—we talked about some depression. He said he had been on antidepressant medication. But in terms of, you know, his appearance to me when I spoke with him, I mean, he wasn't actively depressed where it was interfering in the interview in any way. So we did talk about some prior depression. He said he had been on Prozac. But again, in terms

of my interaction with him I didn't feel that was a factor in my interview with him." *Id.*[4] In addition, as the Magistrate Judge pointed out, "during the course of the [Petitioner's post-arrest statement to police], Petitioner never indicated that he lacked sufficient mental capacity to know and understand what he was doing or that he did not know and understand that his conduct was wrong. He did not claim that he had ever sought or received treatment for a mental illness or was suffering from any of the symptoms set forth in the instant petition." Report at 18. The Report thus concluded that "it was not unreasonable for counsel to conclude an insanity defense was not viable." *Id.*

In his Objections, the Petitioner claims that the two medical experts "were brought on specifically to evaluate whether [the Petitioner], whose native language is not English, had sufficient language abilities to understand the nature and consequences of the waiving of his *Miranda* Warnings." Obj. at 4. The Petitioner also chastises the Magistrate Judge for "speculating that trial counsel had a legitimate tactical reason for failing to pursue a mental defense based on insanity." *Id.* at 4. In support, the Petitioner says that he suffered a "mental deterioration stemming from his violent past in his native country, cumbersome family issues, [and] physical ailments." *Id.* The Petitioner, in sum, objects to his trial lawyer's failure to investigate and present an insanity defense.

The Sixth Amendment affords a criminal defendant the right to "the Assistance of Counsel for his defen[s]e." U.S. Const. amend. VI. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, a habeas litigant must demonstrate "that (1) his counsel's performance was deficient and 'fell below an objective standard of

---

[4] Dr. Alexander, for his part, didn't comment on mental illness at all. *See generally* Alexander Dep.

reasonableness,' and (2) the deficient performance prejudiced his defense." *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 957 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 687–88).

"Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Fayson v. Sec'y, Fla. Dep't of Corr.*, 568 F. App'x 771, 773 (11th Cir. 2014) (cleaned up). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. And "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Id.* at 690. Decisions about "which lines of defense to pursue" are the paradigmatic example of "strategic choices" because they "are owed deference commensurate with the reasonableness of the professional judgments on which they are based." *Strickland*, 466 U.S. at 681. "Among the factors relevant to deciding whether particular strategic choices are reasonable are the experience of the attorney, the inconsistency of unpursued and pursued lines of defense, and the potential for prejudice from taking an unpursued line of defense." *Id.*

As a preliminary matter, the Petitioner's suggestion that the Magistrate Judge "speculat[ed] that trial counsel had a legitimate tactical reason for failing to pursue a mental defense based on insanity," Obj. at 4, ignores the law. The Magistrate Judge was *required* to presume that counsel carried out her duties in a constitutionally effective way, and it's the Petitioner's burden to rebut that presumption. *See Strickland*, 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (cleaned up)). And, as we describe below, the Petitioner has failed to carry that burden.

So, for instance, the Petitioner is mistaken when he insists that both psychologists assessed only his *language* skills—and that neither had anything to say about his *sanity* or *competency*. *See* Obj. at

18

4. Both psychologists, it's true, *primarily* evaluated the Petitioner's capacity to knowingly and intelligently waive his *Miranda* rights. *See* Brannon Dep. at 99–168; Alexander Dep. at 170–256. But Dr. Brannon made clear in his deposition that the Petitioner "didn't display" any "symptoms of depression"—even though the Petitioner reported that he "had been on antidepressant medication." Brannon Dep. at 115–16. And, Dr. Brannon added, while the Petitioner reported that he was depressed—and that he took antidepressants—*after* the incident, the Petitioner (critically) made no mention of "suffering from any mental illness *prior to*" the incident. *Id.* (emphasis added). Dr. Brannon, in short, *did* assess the Petitioner's mental health and raised *no* concerns.

And this is not surprising. No witness in this case ever so much as suggested that the Petitioner suffered from a mental disease or defect. Nor, in his lengthy video-taped statement to the police, did the Petitioner ever try to justify his actions by relying on an insanity defense. To the contrary, according to the State, the video unambiguously reveals a man who understood that murder is wrong, who appreciated the gravity of the situation he was in, and who was trying desperately to avert disaster by relying on a well-accepted "heat of passion" defense. *See* Trial Tr. at 105. The Petitioner (notably) never disputes any of these propositions. *See generally* Pet.; Obj. Other than the Petitioner's say-so, in other words, there is *no* evidence that the Petitioner suffers—or has ever suffered—from *any* mental disease that would have prevented him from either (1) knowing what he was doing or (2) distinguishing right from wrong. Trial counsel thus can hardly be blamed for pursuing a defense theory for which, other than the Petitioner's self-serving diagnosis, there was no evidence. *See Strickland*, 466 U.S. at 681 ("Among the factors relevant to deciding whether particular strategic choices are reasonable are the experience of the attorney, the inconsistency of unpursued and pursued lines of defense, and the potential for prejudice from taking an unpursued line of defense."); *id.* at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of

hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

Counsel, remember, need not pursue every line of inquiry or investigate every possible lead. *See Hittson v. GDCP Warden*, 759 F.3d 1210, 1267 (11th Cir. 2014). Instead, "counsel has a duty to make *reasonable* investigations or make a *reasonable* decision that makes particular investigations unnecessary. Counsel need not always investigate before pursuing or not pursing a line of defense. Investigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly." *Id.* (cleaned up). This is especially true where, as the Petitioner *concedes, see* Obj. at 4, the strategy counsel *did* pursue (the "heat of passion" defense) is a "valid defense"—one the record, in part, supported. *See, e.g.*, Trial Tr. at 432 (claiming to have blacked out from rage); 437 (admitting to having received the divorce papers); 606 (emphasizing that the crime was committed in broad daylight on a weekday morning and that the Petitioner did not try to escape). At the very least—and unlike the insanity defense—counsel's "heat of passion" defense wasn't directly undermined by a taped police interview, a licensed medical expert, *and* the complete absence, from the Petitioner's prior medical record, of *any* history of mental illness. Since the Petitioner cannot show that "no competent counsel would have taken the action that [his] counsel [took]"— namely, pursuing a "valid defense" for which there was some evidence over an unviable one for which there was none—counsel's strategic choice is "virtually unchallengeable" here. *Strickland*, 466 U.S. at 690.[5]

---

[5] For similar reasons, the Petitioner cannot establish that he was prejudiced by counsel's failure to pursue an insanity defense—*even if* that failure constituted an abdication of counsel's constitutional responsibilities. Under *Strickland*, the Petitioner must show a "reasonable probability" that, but for counsel's mistakes, the outcome would have been different. *See Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome."). Given Dr. Brannon's clear deposition testimony, the uneventful police interview, and the absence of *any* prior history of mental illness, the Petitioner cannot meet this high bar.

The state courts' denial of Ground Three was "not contrary to or an unreasonable application of [clearly established federal law]." The Petitioner's fourth objection is thus **OVERRULED**.

### EVIDENTIARY HEARING

The Report recommended denying the Petitioner's request for an evidentiary hearing. *See* Report at 20. The Petitioner objects and asks for "an evidentiary hearing on one or more of the claims"—though he doesn't specify which ones. *See* Obj. at 5.

The Petitioner bears the burden of showing that an evidentiary hearing is necessary. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1060 (11th Cir. 2011). In deciding whether to hold an evidentiary hearing, the Court must consider "whether such a hearing could enable an applicant to prove the petition's *factual* allegations, which, if true, would entitle the applicant to federal habeas relief." *Id.* (emphasis added). The Petitioner has made no effort to explain what additional *facts* might be necessary to resolve his Petition. *See generally* Obj. The Petitioner's fifth objection is thus **OVERRULED** and his request for an evidentiary hearing is **DENIED**.

### CERTIFICATE OF APPEALABILITY

The Petitioner does not object to the Report's recommendation that his request for a certificate of appealability be denied. *See* Report at 22; *see generally* Obj. In any event, a certificate of appealability should issue only when the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). But where, as here, the district court has rejected the petitioner's claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

After a careful review of the entire record, this Court finds that "reasonable jurists" would not find "debatable or wrong" this Court's "assessment of [the Petitioner's] constitutional claims[.]" His request for a certificate of appealability is thus likewise **DENIED**.

***

Having thoroughly reviewed the Petition, the record, and the governing law, the Court

**ORDERS AND ADJUDGES** that the Report [ECF No. 19] is **ADOPTED**; the Petitioner's

Objections [ECF No. 19] are **OVERRULLED**; the Petition is **DENIED** [ECF No. 1]; any request

for a certificate of appealability is **DENIED**; the Petitioner's request for an evidentiary hearing is

**DENIED**; and all deadlines are hereby **TERMINATED**. The Clerk of Court shall **CLOSE** this

case.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 4th day of March 2021.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     Slobodan Dragic
        B12673
        South Bay Correctional Facility
        Inmate Mail/Parcels
        600 U S Highway 27 South
        South Bay, FL 33493-2233
        PRO SE

        Luke Robert Napodano
        Office of the Attorney General
        1515 North Flagler Drive
        Suite 900
        West Palm Beach, FL 33401
        561-837-5000 x179
        Email: luke.napodano@myfloridalegal.com

        Noticing 2254 SAG Broward and North
        Email: CrimAppWPB@MyFloridaLegal.com